[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 08-16194
Non-Argument Calendar
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 9, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 06-00115-CV-WLS-1

PATRICIA WINGSTER,
individually and as Administratrix
of the Estate of Jonathan Sheldon
Haynes, Deceased,

                                                              Plaintiff-Appellant,

versus

FREDERICK HEAD,
Warden,
STACEY WEBB,
Deputy Warden,
SERGEANT BELL,
OFFICER WELDELL,
OFFICER STRICKLAND, et al.,

                                                              Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Georgia
_____

(March 9, 2009)

Before HULL, WILSON and PRYOR, Circuit Judges.

PER CURIAM:

Plaintiff-Appellant Patricia Wingster appeals the district court's order denying her request for leave to designate a medical expert and granting summary judgment on her 42 U.S.C. § 1983 complaint in favor of Defendants-Appellees Warden Frederick Head, Deputy Warden Stacey Webb, and Officers Strickland, Jenkins, Wade, and McGee. After review, we affirm.

## I. BACKGROUND

### A. Lawsuit Filed in 2006

Plaintiff Wingster is the mother of Jonathon Sheldon Haynes, who was a prisoner at Autry State Prison. Wingster, as Haynes's mother, filed this § 1983 action, alleging that excessive force by Autry State Prison guards caused Haynes's aneurysm and death. Wingster claims that on October 14, 2004, Haynes was beaten by prison guards and admitted to Mitchell County Hospital. After a CT scan of Haynes's brain showed no "midline shift, acute hemorrhage, or herniation," he was discharged from Mitchell County Hospital and returned to Autry State Prison on October 15. On October 16, Haynes died at Phoebe Putney Medical Center ("Phoebe Putney Hospital") as a result of a brain aneurysm that led to a massive stroke. Wingster claims the October 14 beating caused the aneurysm.

2

**B. Discovery in 2007**

On May 2, 2007, the district court issued its discovery order, which stated that fact discovery was to be completed by October 20, 2007, and dispositive motions filed by November 30, 2007, unless the court granted an extension. The discovery order directed each party to serve disclosures relating to expert witnesses by August 20, 2007, for the case-in-chief and by September 10, 2007, for rebuttal.

On May 14, 2007, Plaintiff Wingster served her initial disclosures. Attachment A to Wingster's disclosures, entitled "Witness List to Initial Disclosures," listed as possible witnesses: "Medical Personnel at the Autry State Prison and medical personnel at Mitchell County Hospital and Phoebe Putman [sic] Hospital . . . who treated Jonathon S, [sic] Haynes." It is undisputed that Dr. Jack Copeland was Haynes's treating physician at Phoebe Putney Hospital and signed the death certificate. Wingster's disclosures indicated that she had not engaged any experts.

On July 20, 2007, Plaintiff Wingster filed her response to Defendant Head's first interrogatories. Wingster's response listed Dr. Copeland's name on at least three different occasions as a "person with information and/or knowledge of those facts" asserted in her complaint, including the assertion that the "excessive use of force . . . proximately caused his (Haynes's) death." Fact discovery closed on October 20, 2007.

3

## C. December 14, 2007, Motion for Summary Judgment

On December 14, 2007, Defendants filed their motion for summary judgment and numerous exhibits, including Dr. Copeland's affidavit.[1] In his affidavit, Dr. Copeland stated that "Haynes did not have any lacerations or bruising, nor did he present any other indicia that he had been the victim of a physical attack or that he had suffered any traumatic injury." Dr. Copeland recognized that Haynes's medical history at Mitchell County Hospital indicated that Haynes had a "hematoma" on the right side of his skull on October 14, 2004. Dr. Copeland stated that "neither Nurse Hutchinson nor myself observed or recorded any evidence of a hematoma on Mr. Haynes' admission to Pheobe [sic] Putnam [sic] Medical Center" on October 16, 2004.

In addition, Dr. Copeland averred that "[t]here was no medical evidence to suggest that Mr. Haynes was the victim of any assault or suffered any major trauma that caused cerebral hemorrhage." Dr. Copeland stated that "[i]t was and is [his] opinion that Mr. Haynes' aneurysm developed from natural causes and was not the result of assault or trauma."

## D. Plaintiff Wingster's Response in 2008

On January 2, 2008, Plaintiff Wingster filed a motion for extension of time to respond to Defendants' summary judgment motion. On January 3, the court

---

[1]The motion also included as attachments the medical records relied upon by Dr. Copeland in his affidavit.

4

granted Wingster's motion. On January 14, Wingster again filed a motion for extension of time, which the court granted on January 17. On January 31, Wingster, for the third time, filed a motion for extension of time to respond to Defendants' summary judgment motion. On February 5, the court granted Wingster's motion.

On February 15, 2008, roughly two months after being served with Dr. Copeland's affidavit, Wingster filed both a response to Defendants' summary judgment motion and a motion for leave to designate a medical expert witness. Wingster's response to the summary judgment motion argued that "[t]he close proximity of [Haynes's] death from a closed head injury and his head being cracked twice by the . . . Defendants' excessive use of force is an obvious proximate cause of his death which can be inferred by the jury without medical evidence." Wingster's response stressed that two inmates, Joseph Archer and Thomas White, had testified that the Defendant Officers beat Haynes in his cell the day or days before his death.

Wingster's response also noted certain Mitchell County Hospital records. Haynes's "Emergency Physician Record" from Mitchell County Hospital states that Haynes was "found unresponsive by guards" and twice indicates that Haynes "ha[d] hematoma ® side of head." Haynes's Discharge Summary from Mitchell County Hospital, filled out by Dr. Barbara Kupka, states, "The patient was

5

transferred from Autry Correctional Institute, status post being found unresponsive, reported a questionable seizure but no witnessed seizure. They said that he had hit his head but there was no significant trauma."

Plaintiff Wingster's motion for leave to designate a medical expert witness stated that Wingster needed thirty additional days to depose Dr. Copeland and to locate an expert of her own. Wingster claimed that she "had no prior notice that [Dr. Copeland's] expert testimony would be submitted." Further, Wingster asserted that she "had no notice that the Defendants' [sic] would contest with medical testimony the proximate cause of the death of Plaintiff's deceased son" and for this reason did not designate a medical expert.

**E. District Court's September 30, 2008, Order**

On September 30, 2008, the district court denied Wingster's motion for leave to designate a medical expert and granted Defendants' motion for summary judgment. The district court first discussed the medical-expert issue.

The district court found that Wingster "was aware of Dr. Copeland from the beginning of the case," as Dr. Copeland treated Haynes at Phoebe Putney Hospital, completed Haynes's death certificate,[2] and was explicitly identified by Wingster as a witness to the case in her response to Defendant Head's interrogatories.[3] In her

---

[2]Haynes's death certificate listed "Left Middle Cerebral Artery CVA" as his immediate cause of death.

[3]The district court noted that, in response to Defendant Head's interrogatories, Wingster produced copies of Haynes's death certificate and treatment records from Phoebe Putney

initial disclosures, Wingster had indicated that possible witnesses included

"medical personnel at . . . Phoebe Putnam [sic]." Later, in response to Defendant

Head's interrogatories, Wingster herself identified the medical personnel at Phoebe

Putney Hospital as possible expert witnesses.

After detailing the case's procedural history, the district court determined

that "[a] reasonable reading of the treatment records and the death certificate would

have shown a reasonable person that causation could be an issue" and that

Wingster "ha[d] not been diligent in discovering this or any aspect of the case."

The court noted that Defendants filed Dr. Copeland's affidavit on December 14,

2007. Wingster obtained three extensions of time and eventually filed her response

to the summary judgment motion on February 15, 2008. The district court pointed

out that, as of the date of its September 30, 2008, order, Wingster's motion had

been pending for over six months, but Wingster had shown no signs of progress in

identifying an expert, as follows:

> In Plaintiff's motion for leave to designate an expert, Plaintiff
> does not state that she has even attempted to find an expert even
> though she has had a copy of Dr. Copeland's affidavit since at least
> December 14, 2007, much less what facts the expert would testify to.
> Plaintiff has not filed any document or notice since the filing of the
> motion for leave to designate an expert that she has made any progress
> in her search. Plaintiff's motion has been pending for at least 6
> months without any update or statements on the progress of her
> efforts. There has been no statement as to why Plaintiff failed to
> locate an expert in the first place or why she has not at least identified

Hospital, all of which listed Dr. Copeland's name.

7

an expert since the date of filing of the affidavit.

(Internal citations omitted.)

As to Defendants' summary judgment motion, the district court observed that inmates Archer and White had testified that Defendants beat Haynes shortly before his death. Although Archer testified that he watched the alleged beating in Haynes's cell, Defendants produced photographic evidence that Archer could not see inside Haynes's cell from his own cell. And White testified only that, on the day of Haynes's alleged beating, he heard screams and assumed they were coming from Haynes's cell. The district court stated that White's testimony "[was] not properly before the Court" because White had not been timely identified as a witness and that "[e]ven so, White's testimony is not that helpful to Plaintiff."[4]

The court also concluded that, even if Archer's and White's testimony created fact issues as to whether Defendants beat Haynes, Wingster still had not shown an issue of material fact as to other elements of her excessive force claim, including causation. The court found that "[a]ll of the admissible evidence, which was presented by Defendants, shows that the aneurysm and stroke are the result of natural causes" and that Wingster had not shown an issue of material fact as to causation. The district court determined that Wingster "produced no admissible

---

[4]On Defendants' objection to its admissibility, the district court noted that White's identity was not revealed until Wingster filed her response to Defendants' motion for summary judgment approximately four months after the close of discovery. In this appeal, Wingster has not challenged the district court's ruling regarding White's testimony.

evidence, other than conjecture and speculation, that the alleged assault caused [Haynes's] death." The district court noted, "In fact, the overwhelming evidence in the record, [sic] shows that Haynes [sic] death was not caused by Defendants." Wingster timely appealed.

## II.  DISCUSSION

### A.  Denial of Leave to Designate Medical Expert

Plaintiff Wingster argues that the district court erred in denying her motion for leave to designate a medical expert.[5] Wingster claims she was surprised by Dr. Copeland's affidavit, noting that Dr. Copeland was not listed as an expert in the Defendants' initial disclosures.[6] Wingster asserts that she had no notice that causation was an issue and that she would have designated her own medical expert had Defendants given her notice they would rely on Dr. Copeland.

When a summary judgment motion is filed, Federal Rule of Civil Procedure 56(f) allows a district court, before deciding that pending motion, to grant a continuance for additional discovery when the party opposing the motion "shows by affidavit that, for specified reasons, it cannot present facts essential to justify its

---

[5]We review discovery orders for abuse of discretion. Brooks v. United States, 837 F.2d 958, 961 (11th Cir. 1988).

[6]Wingster does not appear to have objected to any part of Dr. Copeland's affidavit in the district court.

opposition."[7]  In construing Rule 56(f), this Court has stated that "[b]ecause the burden on a party resisting summary judgment is not a heavy one, one must conclusively justify his entitlement to the shelter of rule 56(f) by presenting specific facts explaining the inability to make a substantive response as required by rule 56(e) and by specifically demonstrating how postponement of a ruling on the motion will enable him, by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact."  Sec. & Exch. Comm'n v. Spence & Green Chem. Co., 612 F.2d 896, 901 (5th Cir. 1980) (quotation marks and internal citations omitted).[8]  The party opposing the motion, here Wingster, may not simply rely on vague assertions that additional discovery will produce needed facts, "particularly where . . . ample time and opportunities for discovery have already lapsed."  Id.  The decision whether to grant a continuance rests in the sound discretion of the trial court.  Id.

Here, we cannot say that the district court abused its discretion in denying Wingster's request for more time to designate a medical expert and to depose Dr.

_____

[7]Fed. R. Civ. P. 56(f) provides:
If a party opposing [a summary judgment] motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
    (1) deny the motion;
    (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or
    (3) issue any other just order.

[8]This Court adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981.  Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

Copeland. Wingster did not meet her burden to "conclusively justify [her] entitlement to the shelter of Rule 56(f)." Id. At least by the time discovery began in December 2006, Wingster was fully aware that Dr. Copeland was her son's treating physician at Phoebe Putney Hospital. Wingster's own initial disclosures indicated that medical personnel at Phoebe Putney Hospital may be called as witnesses. Similarly, Wingster's own responses to Defendant Head's interrogatories identified the medical personnel at Phoebe Putney Hospital as possible expert witnesses and repeatedly named Dr. Copeland as an individual likely to have information as to certain issues in the case, including Wingster's assertion that excessive force proximately caused Haynes's death.

From the start, it was also clear that the cause of Haynes's aneurysm was a medical causation issue beyond the scope of a layperson's knowledge that required competent medical testimony. Yet, Wingster did not depose Dr. Copeland and never identified any other medical expert to establish causation. Indeed, as Haynes's treating physician, Dr. Copeland was a fact witness to the cause of Haynes's death, as opposed to strictly Defendants' own, outside expert. And, even if Defendants failed to timely disclose Dr. Copeland as Defendants' own expert, Wingster has not demonstrated adequately her inability, by the time Defendants' summary judgment motion was filed, to rebut Defendants' contention that causation did not exist.

11

Alternatively, even assuming Wingster was somehow wholly unaware that she needed medical testimony in this case, Dr. Copeland's affidavit, served on Wingster on December 14, 2007, well after fact discovery closed on October 20, 2007, indisputably put her on notice that she needed medical testimony as to causation. After being granted three extensions of time to respond, only on February 14, 2008, did Wingster ask for leave to designate a medical expert witness. And, in her motion for leave, Wingster failed to (1) explain why she still had not identified a medical expert between December 14, 2007, and February 14, 2008, (2) describe how she intended to rebut Dr. Copeland's affidavit, or (3) explain her inability to make a substantive response in her motion for leave. Instead, on February 14, Wingster requested 30 additional days to designate an expert. In actuality, Wingster had until September 30, 2008, when the district court denied her motion for leave to designate a medical expert, to give the district court some reason to believe she could rebut Dr. Copeland's medical testimony. However, just like the time from December 2007 to February 2008, the time from February to September 2008 passed and the district court heard nothing from Wingster.

For the foregoing reasons, we cannot say that the district court abused its discretion in denying her motion for leave to designate a medical expert.

**B. Grant of Summary Judgment**

12

Wingster also asserts that the district court erred in granting summary judgment for the Defendants because there were genuine issues of material fact as to whether Haynes was beaten and whether that excessive force caused his aneurysm and death.[9]

To establish a claim for excessive force, the plaintiff must show that (1) the defendants acted with a malicious and sadistic purpose to inflict harm and (2) that a more than de minimis injury resulted. Johnson v. Breeden, 280 F.3d 1308, 1321 (11th Cir. 2002). Additionally, "[a] § 1983 claim requires proof of an affirmative causal connection between the defendant's acts or omissions and the alleged constitutional deprivation." Troupe v. Sarasota County, Fla., 419 F.3d 1160, 1165 (11th Cir. 2005).

We need not determine whether the evidence creates fact issues as to the alleged beatings. Even assuming Haynes was beaten, Defendants produced unequivocal and uncontradicted evidence from Dr. Copeland, the treating physician, that Haynes's aneurysm was the result of natural causes and was not the

---

[9]We review de novo a district court's order granting summary judgment, viewing the record and drawing all reasonable inference in the light most favorable to the non-moving party. Earley v. Champion Int'l Corp., 907 F.2d 1077, 1080 (11th Cir. 1990). Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

result of any assault or trauma.[10]

And Wingster produced nothing to refute Dr. Copeland's sworn testimony.[11] We recognize that Wingster relies on the temporal proximity of the alleged beatings on October 14 and the aneurysm on October 16. However, this medical causation issue presents a technical and scientific issue that requires the specialized knowledge of an expert medical witness. See Fed. R. Evid. 701, 702; see also Webster v. Offshore Food Serv., 434 F.2d 1191, 1193 (5th Cir. 1970) (stating that summary judgment is appropriate when "the trier of fact would not be at liberty to disregard arbitrarily the unequivocal, uncontradicted and unimpeached testimony of an expert witness [whose] testimony bears on technical questions of medical causation beyond the competence of lay determination.").[12] Simply put, mere

_____

[10]Wingster asserts only a claim for the wrongful death of Haynes. Wingster does not assert a claim for any injuries allegedly suffered by Haynes prior to his death.

[11]It is well settled that "the moving party (here, Defendants) may support its motion for summary judgment with affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993) (quotation marks and internal citations omitted). Further, Wingster may not respond to the motion for summary judgment by summarily denying these allegations but "must . . . set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party." Fed. R. Civ. P. 56(e).

[12]In Webster, the plaintiff sued his employer, claiming that he contracted tuberculosis from his roommate on a submersible drilling rig. 434 F.2d at 1192. The defendant employer moved for summary judgment and submitted the affidavit of Dr. Ziskind, who opined that the plaintiff could not have contracted tuberculosis from his roommate. Id. Dr. Ziskind had examined the roommate and determined that the roommate did not have active tuberculosis. Id. The district court delayed ruling on the summary judgment motion so that the plaintiff could take Dr. Ziskind's deposition; however, the plaintiff never deposed Dr. Ziskind and never offered counter affidavits of medical experts that showed a person without active tuberculosis might transfer the disease to another person or that an active case might spontaneously cure itself. Id. The district court granted summary judgment in favor of the defendant employer. Id. at 1193.

temporal proximity alone does not refute Defendants' specific, medical expert affidavit explicitly averring that Haynes's aneurysm resulted from natural causes and not assault or trauma. As such, we conclude that Wingster has not shown that a genuine issue of material fact exists as to the cause of Haynes's death or that the district court erred in granting summary judgment in favor of Defendants.

**AFFIRMED.**

---

This Court affirmed, stating that summary judgment was appropriate because the testimony was uncontradicted and because "[w]e [were] not confronted with expert testimony which is equivocal or internally inconsistent, or which bears on issues as to which, by their nature, the trier of fact would be entitled to substitute its own practical judgment for the opinion of experts." Id. at 1194.